Good morning, Your Honors. My name is Kelly Steenbach. I'm an attorney with the Federal Public Defender's Office in the District of Nebraska. I appear here today on behalf of Appellant Michelle Marr. This case is about a conviction built not on proof of what happened between March 11th and 12th, but upon course of interrogations, uncharged allegations, and speculation that the government had the jury to engage in in order to fill the gaps of evidence that it could not prove on causation. What the government lacked in proof in this case is substituted with those speculative requests of the jury. Today I'll address, I guess, what the three main issues are on today's appeal. The first being the Miranda or lack of Miranda statements that were acquired from Ms. Marr on three separate occasions. It is Ms. Marr's position that although she was not in custody by virtue of being in handcuffs, that she was due to the techniques and coercion that was used by the FBI during each of these interviews. Judge Goldberg Counsel, were all three in her home or her mother's home? Michelle Marr I believe the first two were in her mother's home and the third one was maybe on the front lawn of her home.  Michelle Marr Thank you. Judge Goldberg And the evidence that, what's the most damaging evidence that was resulting from that? The statements, there are some statements, but nothing, there's no admission, correct? Michelle Marr Right. There's no admission, but the government definitely relied upon the inconsistencies and in that way they are incriminatory and they were definitely interpreted that way. The third interview is probably the most egregious of the interviews. So there was a mistake in the district court's order on the date which I repeated in my brief. The first two interrogations occurred in March, the third one occurred in May. And I think I incorrectly cited that it was also in March, it was actually May. So by that time a significant period of time had passed and the FBI advised Ms. Marr that they had interviewed everyone, people associated with both the decedent and with Ms. Marr, that basically she was a homicide suspect, that there was no other explanation medically or based on what they had collected except for the fact that Ms. Marr had unlawfully killed Mr. Gilpin. Judge Goldberg Which kind of dovetails maybe into one of my questions and I think it's in conjunction with what you're arguing to keep out here on this oppression, which is what was the evidence for the malice of forethought? Was we really couldn't get the closing arguments from the docket. What was the theory of malice of forethought? Ms. Marr Well, certainly the appellee can speak to their theory, but I believe their theory was that it was a reckless disregard for his life based almost entirely on the fact that she had assaulted him in the past. Judge Goldberg Was there any evidence of what the weapon was for the assault? Was there any speculation or discussion of that? Ms. Marr No, there was discussion of what the weapon was. I think there is no evidence that a weapon was used. You may have saw during the cross-examination of the FBI agent, the scene was not investigated literally at all. There's not one photograph of the scene, the bedroom, the stairways, the cement hallways. There's no investigation and thusly they were never able to argue that a weapon was used. Judge Goldberg Was there any evidence that anyone else though? Was there a testimony that someone else was? I know there were a number of people in the home, but that possibly someone else could have been near his bedroom? Ms. Marr It is unknown who came and went in the house. It was the defendant's theory at trial that this injury is not an injury that you and I would have suffered a death from, but because of his long history of alcoholism, he basically bled on any occasion for any reason. So this could have been as simple as a ground-level fall, which I believe was testimony that because of his pre-existing conditions and his severe alcoholism, a mere ground-level fall could have resulted in the kind of bruising and the subdural hematoma that killed him. Judge Goldberg Did they say all of it, counsel? I'm sorry. Did they say all of it?  Judge Goldberg They implied all of it could be. I thought there was some in the makeup cover that weren't consistent with a fall. Ms. Marr The pathologist testified that the constellation made it unlikely that that's what occurred. Judge Goldberg Okay. Thank you. Ms. Marr But any given one, they agreed. Judge Goldberg Thank you very much. That's what I was confused about. Ms. Marr Yes. Thank you, sir. Judge Goldberg Go ahead. Ms. Marr But was there also testimony that had he, given his physical condition, been struck or, I'm sorry, had fallen, he wouldn't have been able then to get back on the bed? Was there also that testimony? Ms. Marr There was. There was testimony that the injury to death would have been fairly short in the matter of seconds. There was some opinions on the low end, one, two seconds, but it could have been more seconds. And that was important to, I suppose, the fact finder because he was found on a bed. And so the government's theory is that had he fell and hit his head, he wouldn't have had enough time to get up and sit on the bed. Judge Goldberg So even though the time of the injury is unclear, the testimony was that whatever that injury was, it would have caused his incapacitation within seconds? Ms. Marr Yes. Judge Goldberg Okay. Ms. Marr And just to wrap up my issues with the Miranda, as I said, the third interrogation is probably worse. And I guess the final thing I wanted to add, in addition to them telling her that she was their only suspect, the FBI also advised Ms. Marr that she was under an obligation to tell them the truth or what they believed to be the truth about what happened because a jury would convict her of murder. It wasn't just a vague, you're going to get in charge, you're going to get in trouble, it's you're going to get convicted of murder if you don't give us explanations. Kind of dovetailing into the different interrogations is the cell phone, which is important because a photograph was taken from that cell phone that the government argued represented Mr. Marr in makeup to conceal his bruises. So the phone was taken during the first interview at Ms. Marr's home. It is our position that there was no consent given. It was merely a product of a will overborne. Her loved one had passed away just the day before. She was told or asked whether there'd be some indication if he had other people at the home that night, if he had contacted anyone. And she gave them the phone and I think the comment was, are you comfortable with this? And she said yes, but it is our position that compliance is not the same as consent. Additionally, they didn't offer her the consent form from the FBI until the following visit, and it's our position that they were attempting to remedy the lack of consent from the first. Probably the most important issue in this case is the 404 issue. There were three separate incidents of prior misconduct that the district court allowed to be explored in front of the jury. The proof of each of those to a person, they were all highly intoxicated events. None of them are corroborated by any independent evidence, despite the fact that law enforcement was called on two of those occasions. How many witnesses testified? The briefs say many, several times. How many witnesses testified about the prior striking of the victim in the head? Okay, so the Halloween party incident, I believe there were two or three people that testified to that. Then there was the beer can and the car incident, which is I think the third one and there was only one witness to that, and that individual was the deceased sister. And then there was an incident that occurred, which is the second incident inside Ms. Marr's kitchen, and there was only one witness to that, which is important. Thank you. I mean, everyone's intoxicated, and none of them testified consistently with their prior statements at the 404 hearing, at trial, to the extent that when the government attempted to rehabilitate the witness to do with the car and the beer can, we're not even talking about the same season. You know, she anchors something. I know it was winter because of these things. Upon rehabilitation, well, if I said it was July, probably that was. That's just not believable or reliable, even to present to a jury. And it's that propensity evidence that I think sways the jury to think that it must have been a striking or a beating of some kind, as opposed to some of the other possible medical reasons that this individual with such a long history of alcoholism suffered from a bleeding in his brain that caused his death. How long was the trial? How long was the trial? I think four days. How long did the jury deliberate? I don't remember. Maybe four or five hours. Do you have anything else, or do you want to save for rebuttal? Yeah, I'll save it for rebuttal. Very well. Thank you. Ms. Hinrichs, we'll hear from you. Thank you. Good morning. May it please the Court, I'm Sarah Hinrichs, representing the United States in this matter. After a trial on February 7th of 2025, a jury found Michelle Marr guilty of second-degree murder and obstruction of justice. And on June 6th of 2025, the District Court sentenced her to a guideline sentence of 300 months on Count 1 and 240 months on Count 2 to run concurrent. The government's asking the Court to affirm her conviction and her sentence as both were proper. The conviction was clearly supported by the evidence in this case. I know we focused on statements that the defendant made during each of the three interviews, as well as evidence that was found on her phone, a picture of the victim that was timestamped 12.05 p.m., which was just shortly before Ms. Marr called 9-1-1 to report finding her significant other. Shortly, how long, counsel? Within minutes, Your Honor. I believe 10 to 15 minutes. I think the 9-1-1 call was just before 12.30, and 12.30 is about when first responders arrived to Ms. Marr's home and actually found Jesse Gilpin, got him into the ambulance, and transported him to the  What's the significance of the timestamp? The significance of the timestamp is that in that picture, no evidence of injury is apparent to Mr. Gilpin. You don't see any bruising under his eyes, any swelling. It's also significant because Mr. Gilpin is on the bed, which is where he was found by first responders, and that ties into the importance of how soon the injury he suffered would have incapacitated him, which would have been within seconds based upon evidence testified to by the neurosurgeon who treated Mr. Gilpin at the hospital in Sioux City. Was he moving in the photo on the phone, the image on the phone? No, Your Honor. The image on the phone is really of kind of the middle of his torso up. Mostly you see his head. You can tell he's laying on the bed based on the bed spread that can be seen. His eyes are closed. I mean, he does not appear to be conscious, moving. There's no evidence to suggest that. Can you elaborate, then, what's the significance of the photo? The significance of the photo is it shows, at that time stamp of 12.05, he was certainly lying on the bed, apparently unconscious, with no outward evidence of injury or bruising, to suggest that the makeup found when he was treated at both 12 Clans Hospital in Winnebago and then later in Sioux City at Mercy One had already been applied to his face. You have to take that photograph, then, in conjunction with testimony from Officer Benson, who was called by EMTs to assist him. Is that important, that the makeup had been applied before the photo was taken? It goes to Ms. Marr's intent to obstruct any investigation. I mean, certainly had his injuries been readily apparent to first responders when they arrived at her home, that may have changed the entire course of the investigation. By hiding those injuries, they just assume we have an individual here who is unconscious for some reason or another, but there's no evidence that he had any particular injury. Evidence of that bruising would have suggested, particularly the bruising under the eye, would have suggested that there was a head injury, which may have led to more questioning and changed the course of how that scene was investigated or not, as the case may be. So that's important evidence both as to the obstruction, but also as to the second-degree murder. In addition to the evidence that was found on Ms. Marr's phone, we also heard testimony, as this Court brought up with Ms. Steenbach, regarding prior incidents of domestic violence that occurred between Ms. Marr and Mr. Gilpin. What was the instruction that limited that? What was it limited to? Yes, Your Honor. So instruction number 21 that was given to the jury specifically indicated that the jury was only to use these three instances, assuming that they found the incidents occurred by a preponderance of the evidence, that they believed those incidents occurred, as to Ms. Marr's intent. And so if it's just the—this is sort of an interesting case to me, because you almost have a whodunit, because there's no murder weapon that anybody could identify. Maybe it's a hand, but maybe it's something else. There's no witnesses. And so the 404B almost seems to be doing more than just intent. It almost seems to be doing a little propensity work here. I think that's why the limiting instruction was so important. The Court was very clear in its order on the 404 evidence that that evidence was only coming in for the purpose of showing intent with regard to the second-degree murder charge. And the jury was instructed that that was how they were supposed to limit their use. And we should assume, without evidence to the contrary, that the jury followed those instructions. Right. And we do that. We assume that juries follow the instructions. This seems like a very hard line for, frankly, even me to draw, much less a jury who doesn't see these regularly. And I'm just curious on your thoughts about how close that line really is in a case like this, where you're really looking around and asking the jury to say, find the person that you have pointed out as the one that you believe did this, when there's really very little physical evidence of that. There may be very little physical evidence. I mean, certainly, it would be great if we knew if a weapon was involved or if Ms. Marr simply used her hands or her fists or — Right. Right. And I — and maybe I made my question too long and it acted like it had more questions embedded. I just wondered about that fine line between propensity and intent in this particular case. It is a fine line, Your Honor. But the evidence, as it was used, as it was argued by the government based upon the ruling given by the court, and then ultimately how it was considered based upon that limiting instruction, we have to assume that the jury followed that limiting instruction and that it spoke specifically to Ms. Marr's intent in this circumstance to inflict physical injury in a wanton disregard of the fact that that physical injury could ultimately end in a real offense. Not just intent, but her actual — the act of it. Not just the intent to do it, but the actual act, right? Correct. That's a spillover, probably, effect of the 404B beyond intent. Well, ultimately, the court found that the 404B evidence was relevant to show intent. And the government's position is that that is the limited purpose for which it was used, that based upon the witnesses that testified regarding these three prior incidents that the court permitted, and based upon how the jury considered that, they found the witnesses credible and that they used that evidence for the limited purpose that the court provided. But even if the court — this court were to determine that it doesn't speak directly to intent, it also speaks to other permissible purposes under Rule 404B. It speaks to lack of — or lack of mistake, lack of accident with regard to Ms. Marr's action. But the jury was not instructed on that, correct? The jury was not instructed on that. Which is an interesting question, right? If they're — one of the defenses is, well, this could have been an accident. He could have fallen. Then the jury gets the 404B. And as you say, we assume that they follow the instructions. And the only thing that they could consider that evidence for was state of mind or intent. It wouldn't have been relevant to those other — other arguments. Certainly. And we presume that the jury did consider him for the limited purposes of intent because that's how the jury was ultimately instructed. Was it ever discussed to — right? To — in the jury instruction conferences to include, oh, you could also have 404B evidence to counter this argument of accident or some other kind of fall? We didn't have those specific discussions as I recollect them here this morning, Your Honor. Did the defendant say in any of these interviews that there'd been any other person involved? No, Your Honor. In assaulting the victim? No. The defendant's consistent position throughout all three of these interviews was that she passed out from having consumed alcohol at about 5 p.m. and that she did not wake up or come to again until around 1130 or noon the following day, which is when she found Mr. Gilpin unconscious. So I think the defendant took the position she didn't know. But based upon the testimony of her adult children who also lived in the home, the jury could have reasonably found and the evidence clearly supported the idea that Ms. Marr really was the only person who had access to and contact with Mr. Gilpin at the time that those injuries would have been inflicted. Was there any evidence of forced entry to the residence or anything like that? There was no evidence of forced entry to the residence. The FBI interviewed all of the individuals, other individuals that lived in the residence and had been coming and going from the residence. They left earlier in that evening around 8 or 8.30 to go to a skating rink in Sioux City. They reported coming back much later, I believe 11 or 11.30 p.m. Now on the matter of the makeup, did the defendant say at one point that the victim put on the makeup himself? Yes. The defendant gave several explanations for the makeup. One of the explanations that the defendant provided was that the victim had applied the makeup to himself. She also indicated... In the morning? In the morning at some point. But again... In the morning. So that was inconsistent with the statement that he never woke up? That would have... Well, it would have been inconsistent because after he... It would have been inconsistent with him having applied the makeup after the injury because the medical testimony and the medical evidence is that upon receiving that injury, he would have been rendered unconscious within seconds. But I thought you said that she also made a statement to the agents that he went to sleep and never woke up. She did, yes. And that's just... I thought you were being consistent with that too, wasn't it? Yes. One example of the many inconsistencies the dependent provided in her statements. Thank you. All right. Thank you for your argument. We have just a brief time left, but we'll hear rebuttal. Time for rebuttal. Just to go back to the Court's questions about the makeup, Ms. Marr did indicate, and I think the evidence overall showed that Mr. Gilpin fell and was injured all the time and that he had asked Ms. Marr to place makeup on his face and body to hide those injuries from his grandchildren. And I think that that's important to take into the whole context because nobody knows when he put that makeup on. And as to Judge Kelly's commentary about propensity and the admissible purposes, ask yourself whether or not the jury would be inclined to have given the FBI a pass on its lack of investigation had it not this history that unfolded that made Ms. Marr out to be this monster who is absolutely hell-bent on beating Mr. Gilpin on each opportunity. And so I appreciate all your time today, Your Honors. Thank you for having me today. Very well. Thank you for your argument. Thank you to both counsel. The case is submitted and the Court will follow the decision in due course.